1   STEVEN G. KALAR
    Federal Public Defender
2   BRANDON M. LEBLANC
    Assistant Federal Public Defender
3   450 Golden Gate Avenue
    San Francisco, CA  94102
4   Telephone:  (415) 436-7700
    Facsimile: (415) 436-7706
5   Email: brandon_leblanc@fd.org

6   Counsel for Defendant Angelo Cibrian

7

8               IN THE UNITED STATES DISTRICT COURT

9             FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

| | | |
|---|---|---|
| 11   UNITED STATES OF AMERICA, | ) | Case No. CR 13-0447 EMC |
| 12          Plaintiff, | ) | |
| 13         v. | ) | **DEFENDANT'S SENTENCING MEMORANDUM** |
| 14   ANGELO CIBRIAN, | ) | Honorable Edward M. Chen |
| 15          Defendant. | ) | Date:  June 18, 2014<br>Time: 2:30 p.m. |

16

17

18

19

20

21

22

23

24

25

26

**INTRODUCTION**

On February 5, 2014, following a stipulated testimony bench trial, this Court found defendant Angelo Cibrian guilty of being a felon in possession of a firearm and ammunition roughly a year earlier on February 27, 2013 – in violation of Title 18 U.S.C. Section 922 (g)(1).  *See* Docket Entry Nos. 44, 45.  Mr. Cibrian is now set for sentencing before this Court on June 18, 2014.  *See* Docket Entry No. 47.

According to the United States Probation Office ("USPO"), Mr. Cibrian's criminal history places him in criminal history category V, with a total offense level of twenty-four (24).  *See* Presentence Report ("PSR") ¶¶ 18-26, 42.  The corresponding United States Sentencing Guidelines range, at that calculation, is ninety-two (92) to 115 months in custody.  PSR ¶ 68; PSR, Sentencing Recommendation.

However, Mr. Cibrian vehemently objects to the USPO's Guidelines calculation because it fails to properly include a two-level downward adjustment for "acceptance of responsibility" pursuant to U.S.S.G. § 3E1.1(a).  *See United States v. Villasenor-Cesar*, 114 F.3d 970, 972 (9th Cir. 1997) (granting the defendant a two-level downward adjustment for acceptance of responsibility following a stipulated testimony bench trial); *see also United States v. Espinoza-Cano*, 456 F.3d 1126, 1129-38 (9th Cir. 2006) (granting an illegal reentry defendant, sentenced here in the Northern District by District Judge Illston, a two-level adjustment downward for his acceptance of responsibility after he, like Mr. Cibrian, proceeded by way of a stipulated bench trial); *see also United States v. McGregor*, 12CR200-WHA,[1] Docket Entry No. 109, 22-23 (reducing the defendant's offense level by two levels for his acceptance of responsibility, after the defendant, like Mr. Cibrian, proceeded by way of a stipulated testimony bench trial following, as here, a hotly-

---

[1] Specifically, in *McGregor*, District Judge Alsup stated "Look. I think [the defendant] ought to get the two points because he did do the stipulated [testimony] trial. While it's not an admission, that's pretty close to an admission, and that saves some resources and so forth . . . Accordingly, the offense level is decreased by two levels." *See* 12CR200-WHA, Docket Entry No. 109, 22-23.

1   disputed evidentiary hearing where the defendant's motion to suppress a firearm and ammunition

2   was denied by District Judge Alsup).  These cases – two of which resolved in this very courthouse –

3   are entirely consistent with the posture of Mr. Cibrian's case and provide guideposts for why Mr.

4   Cibrian ought to receive at least a two-level adjustment for acceptance in this case as well.

5   　　　　As this Court may recall, after the Court denied Mr. Cibrian's motion to suppress on January 7,

6   2014, the defense *immediately informed* the Court that Mr. Cibrian intended to pursue a stipulated

7   testimony bench trial, for the sole purpose of preserving his right to appeal this Court's denial of his

8   motion to suppress.  *See* Docket Entry No. 43.  In response, the Court set the matter for a "Bench

9   Trial/F. Status" on February 5, 2014.  *Id.*  Thereafter, on February 5, 2014, the Court held the

10  stipulated testimony bench trial as anticipated.  *See* Docket Entry Nos. 44, 45.  The bench trial lasted

11  eight minutes.  *See* Docket Entry No. 45.

12  　　　　In other words, *as quickly and forthrightly as practicable following the Court's final denial of*

13  *his motion to suppress,* Mr. Cibrian (1) informed both the Court and the government of his intention

14  to pursue a stipulated testimony bench trial, rather than a jury trial; and (2) at the very next date set

15  by this Court, the bench trial was held as expected.  In this way, apart from challenging the validity

16  of the police conduct that lead to his arrest in this case (as is his constitutional right), Mr. Cibrian, as

17  swiftly as possible, preserved important judicial and prosecutorial resources by notifying the

18  government and Court of his intention to pursue a stipulated testimony bench trial – which

19  effectively operates like a guilty plea – and then did so at the very next court date.  These facts

20  militate in favor of him receiving at least a two-level reduction for acceptance under U.S.S.G. §

21  3E1.1(a).  *See Villasenor-Cesar*, 114 F.3d at 973-76.

22  　　　　And yet the USPO – joined by the government – asserts that because Mr. Cibrian "never

23  [expressly] admitted that he committed the crime" and continues to "challenge the [legal]

24  admissibility of the evidence against him[,]" he has "not clearly demonstrated acceptance of

25  responsibility."  PSR, Addendum to the Presentence Report, ¶ 6.  This position is inconsistent with

26  the above-cited case law, two of which are Northern District cases, and essentially takes an overly

1    doctrinal and flawed view of the requirements for a defendant to receive acceptance under the

2    Guidelines. Specifically, a defendant does not, as the USPO demands, have to admit to committing

3    the offense in order to receive a reduction for acceptance. The Ninth Circuit expressly stated so in

4    *United States v. McKinney*, declaring that "[a] defendant is not required to [admit to] or plead guilty

5    to receive the acceptance of responsibility reduction." 15 F.3d 849, 853 (9th Cir. 1994). Nor is a

6    defendant required to abandon a purely pre-trial legal challenge, as Mr. Cibrian has advanced here

7    (and may continue to advance in any appeal), in order to receive acceptance. *See Villasenor-Cesar*,

8    114 F.3d at 974 (explaining that a defendant may receive acceptance "while making a legal challenge

9    at trial"; *a fortiori*, the same is necessarily also true for a pre-trial legal challenge). And these are

10   just the legal arguments for why Mr. Cibrian ought to receive at least a two-level reduction for

11   acceptance under U.S.S.G. 3E1.1(a).

12         But there are also sound policy arguments for granting Mr. Cibrian a two-level reduction for

13   acceptance. To explain, the United States Attorney's Office for the Northern District seems to have

14   an unwritten policy of not offering defendants in this District the option of a conditional plea

15   agreement, which would enable a defendant such as Mr. Cibrian to plead guilty to the charged

16   offense following a district court's adverse ruling on a contested legal issue *while also retaining* the

17   right to appeal the district court's ruling. Without the availability of a conditional plea, in the

18   context of a felon-in-possession case, a defendant's only option, should he wish to preserve his right

19   to appeal the district court's adverse ruling on his suppression motion, would be to pursue a

20   stipulated testimony bench trial (which Mr. Cibrian did as swiftly as practicable here). An outright

21   guilty plea, on the other hand, would be fatal to any later-sought appeal of this Court's denial of his

22   motion to suppress. *See United States v. Larson*, 302 F.3d 1016, 1019-20 (9th Cir. 2002). In other

23   words, short of a jury trial, Mr. Cibrian's only option of efficiently resolving this case while also

24   preserving his right to appeal this Court's denial of his suppression motion was to pursue a stipulated

25   testimony bench trial – which he did within mere weeks of his motion being denied. It would now

26   be unfair and inappropriate for this Court to deny him at least a two-level reduction for acceptance

1  because he resolved the case in the only right-of-appeal-preserving-manner available to him.[2,3]

2       For all these reasons, this Court should reduce Mr. Cibrian's offense level by *at least* two

3  levels for acceptance of responsibility under U.S.S.G. § 3E1.1.

4  **PROCEDURAL HISTORY**

5       This Court is surely familiar with this procedural history of this case. On June 19, 2013, the

6  United States filed a complaint against Mr. Cibrian, charging him with being a felon-in-possession of

7  a firearm and ammunition on February 27, 2013. *See* Docket Entry No. 1. On June 27, 2013, Mr.

8  Cibrian made his initial appearance on the complaint before Magistrate Judge Laurel Beeler. *See*

9  Docket Entry No. 2. He was remanded into United States Marshal's custody and has remained in the

10  Marshal's custody since that time. PSR, Cover Page.

11       Thereafter, on September 11, 2013, Mr. Cibrian moved this Court to suppress the firearm and

12  ammunition. *See* Docket Entry Nos. 14-17. The government responded, and after considerable

13  briefing and evidentiary hearing proceedings, this Court ultimately denied Mr. Cibrian's motion to

14  //

15  //

16

17      [2] As it is, Mr. Cibrian, for aggressively litigating his suppression motion, will not receive the benefit of a government recommendation for the third acceptance point under U.S.S.G. §

18  3E1.1(b)(2). Under *Villa-Senor*, however, there is a strong argument that Mr. Cibrian should not only receive a two-level reduction under U.S.S.G. § 3E1.1(a), but should *also* receive the additional

19  one-point reduction under U.S.S.G. § 3E1.1(b)(2), because, in this case, Mr. Cibrian exercised his constitutional right to challenge the admissibility of the evidence against him and upon denial of his

20  motion to suppress, immediately advised the Court and the government of his intention to pursue a stipulated testimony bench trial. *See Villa-Senor*, 114 F.3d at 973-76. An argument can therefore be

21  made that to deny him the third point for acceptance would effectively be penalizing him for advancing his constitutional rights to challenge the legal admissibility of the evidence against him.

22  *Id.*; *see also United States v. Vance*, 62 F.3d 1152, 1157 (9th Cir. 1995) (reversing a district court's denial of the third point for acceptance after the defendant entered into a conditional plea agreement

23  in order to preserve his right to appeal the district court's denial of his motion to suppress).

24      [3] Additionally, if the Court denies Mr. Cibrian an adjustment of responsibility, it would be treating him the same as a defendant who mounted an aggressive, vigorous defense in a jury trial,

25  was convicted and perhaps continued to assert his innocence at sentencing. That is not at all the posture of this case and would make no distinction between such a defendant and Mr. Cibrian, who

26  has only challenged the charge against him on the narrow issue of whether the two police searches of 61 Cameron Way on February 27, 2013, were valid and lawful under the Fourth Amendment.

1  suppress on January 7, 2014.[4]  This Court then held a stipulated testimony bench trial on February 5,

2  2014, and found Mr. Cibrian guilty of unlawfully possessing the subject firearm and ammunition on

3  February 27, 2013.  *See* Docket Entry No. 45.  His sentencing now approaches.

### MR. CIBRIAN'S PERSONAL BACKGROUND AND HISTORY

5          Angelo Cibrian was born in San Francisco in December 1983 "to the marital union of Angelo

6  Ruvalcaba and Andrea Perez" and from there, had anything but an idyllic upbringing.  PSR ¶ 50.  At

7  age three, "his father separated from his mother[,]" which arguably marked the beginning of an even

8  more  troubled childhood – one that was "marred by instability."  PSR ¶ 51.  After his father left, Mr.

9  Cibrian "stayed with his mother in San Francisco."  *Id.*  His mother "ha[s] a serious history of drug

10 addiction and [behavioral] problems" and Mr. Cibrian's continued residence with his mother as a

11 child, according to the presentence investigation, "was contrary to his best interests."  *Id.*  Because,

12 over the years, his mother "was often verbally hostile"  and exercised "poor supervision and control"

13 of Mr. Cibrian and his siblings, they were eventually removed from their mother's care and "placed

14 with their grandparents[.]" *Id.*  Although Mr. Cibrian was fortunate to live with caring, supportive

15 and attentive grandparents thereafter, by the time he moved in with them, his biological parents had

16 already caused considerable emotional damage to him.  As Mr. Cibrian explains in his letter to the

17 Court:

18              I come from a broken home.  I grew up in a dysfunctional family.  My
              mother's an addict/alcoholic.  My father was an addict and alcoholic but has
19            turned his life around with the support of his wife.  When I was a child I was
              exposed to a lot [of] negativity.  My mother verbally abused me and neither
20            one of my parents inspired, encouraged or motivated me to be anything good
              in life.

21

22 //

23 _____

24      [4]    Technically, the Court denied Mr. Cibrian's motion to suppress on October 10, 2013.  *See*
   Docket Entry No. 26.  However, that ruling seemed subject to reconsideration until the completion of
25 later-ordered evidentiary hearing proceedings, which concluded on January 7, 2014, and at which
   point the Court indicated that Mr. Cibrian's motion to suppress was still or remained denied.  The
26 January 7, 2014 date is therefore being used here as the control date for when this Court ultimately
   denied Mr. Cibrian's motion to suppress.

1   *See* Exhibit A: *Angelo Cibrian's Letter to the Court.*

2          Unsurprisingly, this mix of unavailable and disinterested biological parents, a negative and

3   unstable home environment and years-long verbal abuse left the young Mr. Cibrian emotionally

4   unsettled.  Even after he began living with his grandparents, that is, Mr. Cibrian still longed for a

5   certain level of attention and care that he continued to feel had never been available to him.  He

6   sought out that attention and support from other young men in his neighborhood, which was a gang-

7   infested area of the Mission area of San Francisco.  And in time, the young and emotionally

8   vulnerable Mr. Cibrian fell under the spell of seemingly well-intentioned gang members in his

9   neighborhood, which, on the one hand, provided him with a sense of community and care that he

10  was desperate to have – and, on the other hand, also marked when he started to get exposed to and

11  become involved with criminality through his newfound gang affiliation. As Mr. Cibrian recalls:

12                  It was hard growing up not having stability, unconditional love, [a]
                    stable environment with undivided attention from either parent.  And
13                  I let the wrong people influence[] me at a very young age.  I was
                    looking for some kind of stable love and acceptance in all the wrong
14                  places.  It took me a while to realize that the wrong people never
                    really truely (sic) loved nor cared about my life and my well being.
15

16  *See* Exhibit A: *Angelo Cibrian's Letter to the Court.*

17          By the time he was an adolescent, and certainly after he became involved with the

18  neighborhood Surenos, Mr. Cibrian unsurprisingly began having contacts with the criminal justice

19  system – having his first such contact at the age of twelve.  PSR ¶¶ 28, 29.  That he began having

20  contacts at such a young age is telling in two ways.  First, it gives the Court a pretty clear marker of

21  when Mr. Cibrian became involved with the Surenos after searching for the love and support he

22  describes in his letter to the Court.  Second, it highlights in part why, in the years that followed and

23  into his young adulthood, he continued to have additional contacts with the juvenile criminal justice

24  system.  PSR ¶¶ 30-35.  In other words, when any twelve-year-old, including Mr. Cibrian, gets

25  involved with a neighborhood gang, he is obviously vulnerable, easily influenced and can be molded

26  or inculcated with a gang mindset and be made to carry out whatever aims the gang may have.  This

1   was all true for Mr. Cibrian – especially since he was so emotionally hungry for that sense of

2   acceptance and care that the Surenos seemingly offered him; and the juvenile convictions he suffered

3   as a result of his Sureno membership were to Mr. Cibrian merely the *quid pro quo* of retaining the

4   love and acceptance he felt that he received from his fellow gang members.[5]

5          It wasn't until years later, at age nineteen, that Mr. Cibrian was able to finally realize that his

6   affiliation with the Surenos was not in his best interest at all – and that the void he thought his

7   Sureno affiliation filled was actually illusory.  Consequently, in or around 2002, he dropped out of

8   the Surenos, explaining:

9          The best decision I ever made in my life was dropping out of [the Surenos]
           gang in 2002.  And I have no regret till (sic) this day.  That was the biggest
10         and greatest decision of my life.  I no longer have respect towards any gangs
           who prey on adolesc[ents] who are less fortunate with the sole purpose of
11         manipulation.  I was inspired, and had the help and influence from my [then]
           unborn child at the time Damien Cibrian.  Because I could not see a
12         productive future in gang banging.

13  See Exhibit A: *Angelo Cibrian's Letter to the Court.*

14         Unfortunately, by the time Mr. Cibrian defected from the Surenos around age nineteen, he was

15  already a convicted felon and a high school drop-out.  More than that, by that time, he had been shot,

16  his grandparents – who had essentially raised him and provided him with some parental guidance –

17  had both passed away from cancer and his relationship with his biological parents – his mother still

18  suffering from addiction – remained heavily strained.  PSR ¶¶ 52-53, 57, 60.  With no support

19  system, scant job prospects and a newborn child to provide for, Mr. Cibrian set about trying to forge

20  a lawful, productive life forward.[6]  Unsurprisingly, he struggled to find his footing with a checkered

21

22         [5]   *See* NATIONAL INSTITUTE OF JUSTICE, CHANGING COURSE: KEEPING KIDS OUT OF
       GANGS, *available at*, http://nij.gov/journals/273/Pages/preventing-gang-membership.aspx (last
23     visited June 8, 2014) (stating "Youth who feel marginalized, rejected or ignored — in the family,
       school or church — may join a gang to fill a need for support.  Some youth join a gang for a sense of
24     belonging, viewing the gang as a substitute or auxiliary family.")

25         [6]   A similar account of Mr. Cibrian's upbringing up until the age of nineteen is set forth in
       Cathy Estensen's letter to the Court.  Ms. Estensen is the grandmother of Mr. Cibrian's oldest child
26     and she writes:

1    background and few employable skills. In time, he slid back into something he learned during his

2    time with the Surenos: selling drugs as a means of earning money. PSR ¶¶ 37-39.  As verified by his

3    criminal history, after Mr. Cibrian parted ways with the Surenos, three of the four convictions he

4    suffered were drug-related as he resorted to one of the only ways he really was familiar with to earn

5    money and as a means of paying for his own addiction issues.[7] *Id.*

6         This, of course, brings us up to the present. More recently, Mr. Cibrian has been trying to

7    figure out how to move forward positively in life, while also trying to shake a nagging addiction to

8    methamphetaime.  The combination of having a conviction-heavy background, his own addiction,

9    parental obligations and few skills has continued to bog down Mr. Cibrian's progression during

10   adulthood, but thankfully, the time he has spent in custody in relation to the instant matter has been

11   meaningful for him and has given him time to really contemplate how he can change his life for the

12   better.  He deeply, hungrily wants to be a better, more available parent to his two children, in a way

13   that his own parents were not available to him.  He does not want to subject his children to even a

14   remotely similar upbringing as he experienced as a child.  And since he has been in custody, he has

15   realized that his conduct over the years is essentially doing just that.  While he isn't abusive in the

16   _____

17        I know Angelo as shy, with a capacity for learning and an ability in math that
     unfortunately has been left undeveloped because he quite school in the 6th grade.  I
18   tutored him in reading when he lived with us but again this was unfortunately interrupted
     because of the problems in the relationship between my daughter and Angelo. He comes
19   from a disadvantaged place.  His mother is not emotionally well and has been addicted
     to drugs for many years.  He has many brothers and sisters of different fathers.  The
20   person who was his biggest support, his grandmother, died around the time he turned 18.
     He has not had the calm, steady voice of a parent who could help him sort out his
21   problems and he has been impulsive in his decision making process.  I know him as
     helpful, funny, shy, a man who is still a boy who loves his son and feels embarrassed and
22   ashamed that he cannot read as well as Damien.

23   *See* Exhibit B: *Letters of Support*; Exhibit C: *Photographs*.

24        [7]   Notably, other than a felony evasion conviction at age twenty-two, none of Mr. Cibrian's
     adult convictions involve any violence whatsoever. PSR ¶¶ 35-39.  And whether Mr. Cibrian's
25   felony evasion conviction, under California law, can be considered a categorically violent crime is an
     open question. *See Penular v. Mukasey*, 528 F.3d 603, 608-611 (9th Cir. 2008); *see also Sykes v.*
26   *United States*, 131 S. Ct. 2267, 2273-76 (2011).

1  way his mother was towards, the revolving door of him going in and out of custody has a different

2  negative type of impact and Mr. Cibrian longs to be a better, engaged father and positive role model

3  for his children.  As he shared with the Court:

4

5       I know the choices and decisions that I made in life not only impact my life.
     But have also impacted the lives of those around me.  It's important for me

5       to become a better role model for my kids and the people around me . . . I'm

6       really desperately trying to get back to my kids.  It's important for me as a
     father, for me to love, care and protect both my kids and give them right

7       direction.

8  *See* Exhibit A: *Angelo Cibrian's Letter to the Court*.  And that is Mr. Cibrian's focus here: to use his

9  time in custody productively and to return to his children as a sober, better and improved father.  *Id.*

10  Not only that, but Mr. Cibrian hopes, upon his release, to engage his community and to provide

11  mentoring to troubled youths who face the same challenges he faced growing up.

12       Let's hope, for Mr. Cibrian's sake, that while he is in custody, he uses his time productively,

13  focuses on his self-improvement (which he has been actively doing) and charts a workable path

14  forward, so that when he eventually returns to the community, he can live a law-abiding, productive

15  and healthy life – leaving behind any further criminality.  For Mr. Cibrian, he no longer regards as an

16  option engaging in any conduct whatsoever which could jeopardize his freedom and separate him

17  from his children.  With the Court's support, the renewed support of his family and Mr. Cibrian's

18  emergent new direction, he is actively preparing to thrive and succeed and fully intends to use his

19  time in the BOP as productively as possible.  *Id.*

20      **FORTY-EIGHT (48) MONTHS INCARCERATION IS
    SUFFICIENT, BUT NOT GREATER THAN NECESSARY**

21      **TO SATISFY THE SENTENCING OBJECTIVES OF 3553(a)**

22       After *United States v. Booker*, 543 U.S. 220 (2005), the Guidelines are merely advisory.

23  *Kimbrough v. United States*, 552 U.S. 85, 108 (2007).   The district court is not required nor even

24  expected to impose a sentence within the presumptively applicable Guidelines range.  *United States v.*

25  *Orlando*, 553 F.3d 1235, 1238 (9th Cir. 2009).  Rather, after correctly calculating the applicable

26  Guideline range, the district court must consider the totality of the circumstances and impose a

1  sentence that is sufficient, but not greater than necessary, to serve the statutory purposes of

2  sentencing in § 3553(a). *Id.* at 1238; *Kimbrough*, 552 U.S. at 101. "The court has broad power to

3  make a reasoned decision on the individualized facts before it." *Orlando*, 553 F.3d at 1239; *see also*

4  *United States v. Ellis*, 641 F.3d 411, 423 (9th Cir. 2011) (noting the district court's "broad

5  discretion").

6        Before addressing *Booker* and the relevant Section 3553 factors here, the Court must first

7  correctly calculate the Guidelines range. *United States v. Rivera-Ramos*, 578 F.3d 1111, 12 n.1 (9th

8  Cir. 2009). Apart from the dispute regarding whether Mr. Cibrian should receive at any reduction for

9  acceptance under U.S.S.G. § 3E1.1(a), which is addressed at length above, Mr. Cibrian agrees that

10 the Guidelines calculations set forth in the PSR area otherwise correct in this case.[8]  However, if this

11 Court agrees with Mr. Cibrian that he ought to receive at least a two-level reduction for acceptance,

12 then his adjusted Guidelines range would become seventy-seven (77) to ninety-six (96) months in

13 custody.  PSR ¶¶ 18-26, 41-32; PSR, Sentencing Recommendation.  And Mr. Cibrian respectfully

14 requests that, given that his childhood was "marred by instability;" that he was poorly raised from an

15 early age by a manipulative, abusive and drug-addled mother; that his father also suffered addiction,

16 abandoned the family at an early age and later exposed him to marijuana as a teenager; and that his

17 formative years were spent being "bounced between various family members and juvenile hall" –

18 that this Court should impose a forty-eight (48) month custodial sentence here, which would be

19 sufficient, but not greater than necessary to satify the sentencing objectives of 18 U.S.C. § 3553(a).

20 PSR, Sentencing Recommendation.

21       In addition to the myriad details of Mr. Cibrian's personal background set forth above, the key

22 Section 3553 factor Mr. Cibrian asks the Court to consider in imposing a considerable variance from

23 the advisory Guidelines range is his neglect-filled background and adversity-filled personal history.

24 In undersigned defense counsel's years of representing indigent clients, Mr. Cibrian's early entrance

25

26      [8]  There are, however, other unresolved objections to the PSR that do not impact the
Sentencing Guidelines calculations in this case, but will need to be addressed at sentencing.

*U.S. v. Cibrian*, CR 13-00447 EMC;
DEF.'S SENTENCING MEM.                          - 10 -

1    into a gang at age twelve and the onset of criminal activity that soon followed stands out about how

2    difficult of a home life this defendant must have experienced as a child and, further, how once he set

3    upon a criminal path at such an early age, how exceedingly difficult it would have been for him to

4    completely remove himself from that lifestyle in the years that followed, in the absence of any

5    meaningful parental or positive social support.  This is not meant to cavalierly suggest that Mr.

6    Cibrian is not wholly responsible for his past criminal conduct (both as a juvenile and as an adult),

7    but his deeply challenged upbringing provides this Court with a criminal prism through which to

8    scrutinize the entirety of his criminal history and the instant offense.  And what it suggests is that

9    while Mr. Cibrian was gang-affiliated at an early age and engaged in juvenile gang activity, after he

10   dropped out of the gang, the nature of his criminal conduct as an adult appears to have narrowed to

11   periodic, drug-related activity as a means of earning money.  PSR ¶¶ 35-39. This, too, is

12   understandably concerning, but suggests that Mr. Cibrian has not been engaged in violent criminal

13   activity in over a decade (since he was a juvenile) – and that, despite this being a felon-in-possession

14   case, he is not someone who assertively uses or engages in other criminal conduct that involves

15   firearms.

16        But, most importantly, Mr. Cibrian urges the Court to vary downward, based upon the totality

17   of his background and his exceedingly difficult upbringing, which is a sentencing factor that the

18   Court may and should consider. In *United States v. Floyd*, a case involving the pre-*Booker*

19   sentencing scheme, the Ninth Circuit upheld a district court's downward departure from the

20   sentencing Guidelines based on lack of youthful guidance. 945 F.2d 1096, 1099 (9th Cir. 1991),

21   *amended by* 956 F.2d 203 (1992) (original opinion inadvertently omitted case number), and

22   *overruled on other grounds by United States v. Atkinson*, 990 F.2d 501 (1993).  Not unlike Mr.

23   Cibrian, Mr. Floyd had a disadvantaged and abusive upbringing. The Court in *Floyd* upheld the

24   departure because a lack of youthful guidance constitutes information concerning the "background,

25   character, and conduct of a person" that a court of the United States may receive and consider for the

26   purpose of imposing an appropriate sentence. *Id.* at 1100 (citing 18 U.S.C. § 3661).

1    *Floyd* is particularly instructive now that the Guidelines are advisory. While the Sentencing

2    Commission in 1992 published a policy statement in response to the *Floyd* case stating that lack of

3    youthful guidance is not normally relevant in determining whether a departure is warranted, *see*

4    U.S.S.G. § 5H1.12, sentencing courts now have a broader duty under § 3553(a) to consider *all*

5    *factors* that are relevant to sentencing, including lack of youthful guidance and a disadvantaged

6    upbringing. Indeed, this particular sentencing factor is now highly relevant given section 3553(a)'s

7    mandate that courts must consider a defendant's background and history in imposing an appropriate

8    sentence. *See* 18 U.S.C. § 3553(a)(1).

9        Without proper support, Mr. Cibrian's life was off-course from the outset, and his lack of

10   guidance and abuse and neglect as a youth has played more than a significant role in his decision-

11   making since age twelve. As expressed by the Probation Office, Mr. Cibrian's "early childhood was

12   marred by instability" and it seems imminently apparent that his difficult upbringing and his

13   corresponding early entrance into the criminal justice system are correlated. PSR ¶ 51.

14       Although those who should have cared for Angelo dramatically failed him during his

15   upbringing, it is now time for the system to help him succeed. For these reasons, the Court should

16   consider Mr. Cibrian's background and history in imposing a sentence significantly below the

17   advisory Guidelines.

18       There are several other Section 3553 sentencing factors that support a variance from the

19   Guidelines range in this case. For example, the Court must consider the need for the sentence

20   imposed "to reflect the seriousness of the offense, to promote respect for the law and to provide just

21   punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). Section 3553 further requires the Court to

22   consider whether the proposed sentence would "afford adequate deterrence to criminal conduct" and

23   "protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(B), (C). Finally,

24   the Court is instructed to craft a sentence that will "provide the defendant with needed educational or

25   vocational training, medical care, or other correctional treatment." 18 U.S.C. § 3553(a)(2)(D).

26   //

1   All of these goals would be achieved by the requested sentence of forty-eight (48) months. The

2   proposed sentence would adequately reflect the seriousness of this offense.  It also would deter him

3   from future crimes and protect the public: he will be incarcerated for a lengthy period of time, indeed

4   it is a custodial prison sentence that approaches matching the entirety of the total amount of prison

5   that has been imposed upon him as adult.  PSR ¶¶ 35-39.  To suggest that such a sentence would

6   therefore be lenient would be simply mistaken.

7   Additionally, while in custody, Mr. Cibrian has given serious thoughts to his future. *See*

8   Exhibit A: *Angelo Cibrian's Letter to the Court*.  He wants to learn a trade, specifically carpentry or

9   landscaping, and is also interested in college courses. *Id.*  As the Court is aware, a defendant's post-

10   offense efforts at rehabilitation may bear on the Court's determination pursuant to 18 U.S.C. §

11   3553(a)(2)(B) and (C), as evidence that an extended period of incarceration is not necessary to deter

12   future criminal conduct or to protect the public. *See Pepper v. United States*, 131 S. Ct. 1229, 1242

13   (2011).  An extended period of incarceration beyond a forty-eight (48) month sentence is

14   unnecessary to deter future criminal conduct here. Mr. Cibrian has had an awakening. He has grown

15   significantly over the last nearly twelve months and now recognizes that he needs to break free from

16   his past and live a law-abiding life so that he may fully grow into the man he has the potential to be.

17   *See* Exhibit A: *Angelo Cibrian's Letter to the Court.*

18   **CONCLUSION**

19   In closing, the story of Angelo Cibrian, alluded to in the introduction to this sentencing

20   memorandum, is the culmination of a deeply dysfunctional childhood home without any meaningful

21   parental guidance, inculcation into criminality at an early age, and eventual transition into a directionless

22   adulthood.

23   However, having meaningfully reflected on his life, Angelo now sees the relationship between his

24   upbringing and his criminal history more clearly than he ever has before.  And more than can possibly

25   be expressed to the Court, he deeply desires a far better future for himself and his children – and is eager

26   to change and move forward positively with his life.

1      And yet, at the same time, Angelo is exceedingly contrite about being before the Court and is

2   prepared to accept whatever punishment this Court may impose on his sentencing date, understanding

3   that he must serve a considerable prison sentence and then, both while in custody and thereafter, finally

4   abandon his past in order to have any hope of building a brighter future for himself and becoming an

5   engaged, contributing member of society and attentive father to his two children.  However, Mr. Cibrian

6   understands and accepts that he must first serve a lengthy term of incarceration and respectfully requests

7   that, pursuant to 3553(a), the Court impose a forty-eight (48) month sentence upon him.

8   Dated: June 11, 2014                              Respectfully submitted,

9                                                     STEVEN G. KALAR
                                                      Federal Public Defender
10
                                                                /s/
11
                                                      BRANDON M. LEBLANC
12                                                    Assistant Federal Public Defender

13

14

15

16

17

18

19

20

21

22

23

24

25

26

# EXHIBIT A

Dear, Honorable Mr. Chen

How Are You Doing Today Sir? I Do Hope Your In Good Service. I Took The Time To Write This Letter In The Hopes That You Will Have A Better Understanding Of The Kind Of Person I Am Today And The Person I Am Trying To Become. I Come From A Broken Home. I Grew Up In A Disfunctional Family. My Mother An Addict/Alcoholic. My Father Was An Addict And Alcoholic But Has Turned His Life Around With The Support Of His Wife. When I Was A Child I Was Exposed To Much Negativity. My Mother Verbally Abused Me, And Neither One Of My Parents Inspired, Encouraged, Or Motivated Me To Be Anything Good In Life. It Was Hard Growing Up Not Having Stability, Uncond- itional Love, Stable Environment With Undivided Attention From Either Parent. And I Let The Wrong People Influence Me At A Very Young Age. I Was Looking For Some Kind Of Stable Love & Acceptance In All The Wrong Places. It Took Me A While To Realize That The Wrong People Never Really Truly Loved, Nor Cared About My Life And My Well Being. The Best Decision I Ever Made In My Life Was Dropping Out Of A Gang In 2002. And I Have No Regret Till This Date. That Was The Biggest And Correct Decision Of My Life. I No Longer Have Respect Towards Any Gangs Who Prey On Individuals Who Are Less Fortunate With The Sole Purpose Of Manipulation. I Was Insecure, And Had The Idea And Influence From My Unborn Child At The Time Davison Cibrian. Because I Could Not See A Productive Future In Gang Banging. It's Hard Hard For Me To Look Back At My Past History, I Still Live

Regret & Remorse. It's Areas Of My Life I'm trying to forget about, Areas Of My Life that was Really Depressing and Embarrassing. I've spent More than half My Life inside institutions And I Know For A Fact there is More to Life than Committing Crimes And being Incarcerated. I Know the Choices And Decisions that I Made In Life Not Only Impact My Life, But have Also Impacted the Lives Of those Around Me. It's Important For Me to Become a Better Role Model For My Kids And the People Around Me. I Need & I Want this to Change Because I Have A Desire to Change. I Love Life, I Love My Life, And I Do Value Life. I Want Better For Myself, Because I Deserve to Be Better. I Want You ~~can~~ See Some Of the Good Characteristics that I Do Possess, but I guess You Won't Read About In A P.S.I. Report. I'm Gonna Continue to Build Myself Mentally & Spiritually. I Read Alot Of Self-Help, Self-Improvement Because I'm trying to Be A Better Man With Good Morals And Family Values. I Just turned 30 Years Old And I'm Still Learning How to Love Myself. No One Has Never taught Me how to Do that. Please have Mercy On My Sentence Mr. Cause I'm Really Des-perately trying to Give Back to My Kids, It's Important For Me As A Father, For Me to Love, Care, & Protect Both My Kids And Guide them In the Right Direction. My Plans For When I Do Get Release Is to Get Into Carpentry, Land-scaping, And Cooking. And Volunteer / Mentor Youth About the Importance Of Life, Family Morals & Self, Value With the hopes to Stop Gang Violence And Give Back so I

Citizen Myself As An Individual In The Community And In Society. So I Can Have A Good Career. Thank You For Taking The Time To Read My Letter Because It Was Written From The Heart With Great Sincerity. God Bless You Your Honor Have A Nice Day.

With The Upmost Respect

Angelo Cibrian

Angelo Cibrian

# EXHIBIT B

April 5, 2014

To Whom it May Concern,

I am writing this letter out of concern for Angelo Cibrian, who is the father of my daughter

Sasha's first child, Damien.  Angelo lived with us in San Francisco for the first year of

Damien's life in our small townhouse in Bernal Heights, and then for 2 more years when

I moved the family to Roseville, CA.

I am aware that he is in a great deal of trouble.  I know nothing of what he is accused of

doing other than what Angelo himself told me and what his public defender had to say.

I know Angelo as shy, with a capacity for learning and an ability in math that unfortunately

has been left undeveloped because he quit school in the 6th grade.  I tutored him in reading

when he lived with us but again this was unfortunately interrupted because of the

problems in the relationship between my daughter and Angelo.  He comes from a

disadvantaged place.  His mother is not emotionally well and has been addicted to drugs

for many years.  He has many brothers and sisters of different fathers.  The person who

was his biggest support, his grandmother, died around the time he turned 18.  He has not had

the calm, steady voice of a parent who could help him sort out his problems and he has

been impulsive in his decision making process.  I know him as helpful, funny, shy, a man who

is still a boy who loves his son and feels embarrassed and ashamed that he cannot read as

well as Damien.  I remember a time when I was mad at my daughter and him for making some

kind of mess in the house and he hid under the covers when I yelled at him.  He is a

product of the situation he was born into and he seems to have gotten himself deeper

and deeper into a deep well with slick sides and no way out.  The prison system is full

of individuals that may be "good people" but the problem is that good even decent people

sometimes do bad things.  Angelo was in trouble as a youth, and for the time that he was with

us, began to straighten himself out.  He went through a tatoo removal program, he went to

culinary school, and he didn't committ any crimes during that time.  His slide began when

my daughter rejected him, and it was clear he couldn't live here anymore.  The argument

with her led him to take her car and wreck it in a high speed chase on highway 80, and since

that time it has been a downward slide.  Both my daughter and Angelo cost me a lot of money.

I have guardianship still of Damien.  But I also can say that I care about Angelo and I forgive

what he did in that situation because I know it was not his intention to hurt anyone of us.  He

always ends up hurting himself, lacking the confidence to overcome a frightening situation he

reverts back to what he knows and how he grew up.

I don't have any answers and do believe that people need to be held accountable for what

they do.  I also believe that it would be a waste and a tragedy to send him to prison to

spend 10 years getting better at being an outcast, a criminal.  If we lived in a better world,

I would get him into a program with treatment for his anxiety and possibly PTSD, educate

him, make him work for a skill and a place in society.

I feel extremely sad that it has come to this and hope that the decision that is made takes into

account everything about him and not just what he has done wrong.


Thank you for your time.

Sincerely,

Cathy Estensen, RN
Sutter Roseville Medical Center

April 6th, 2014

To Whom It May Concern,

I am writing to share my thoughts pertaining to Angelo Cibrian, my nephew's father and my sister's former partner. I have known Angelo since I was about six years old. At the time Angelo and my sister were living with my mother and I in San Francisco after my nephew's birth. His shy but sweet personality seemed overshadowed by his immature actions. During that time I never really spoke to him, despite living in such close quarters. What I did see was the ghetto neighborhood he grew up in, the sketchy people he was surrounded by, and the consequences of his and my sister's poor choices.

However, I was still too young to really form an opinion on him. In the summer of 2003 we moved to Roseville, California in the hopes of starting anew, and he noticeably changed. With the help of my mother, he began classes at a culinary school and while my sister worked, took care of his son. Angelo was and still is a very loving father. He showed a lot of interest in learning, and exhibited a great skill for math and is a talented artist. If things had been different, if he had continued with school, I am very sure that Angelo would have been an amazingly productive and creative mind active within society.

Before, Angelo did not have a central family for support. I like to believe that we gave him a place to grow.  Everything started to improve -until my sister grew apart from Angelo. I was too young to understand the full extent of the situation, but Angelo slowly began to revert to his old immature, impulsive state. As his relationship with my sister disintegrated, he did not know how to control or work out his emotions. He would simply shut down or burst into tears when things got too stressful. I have always had a conflict in my heart over Angelo. I get so angry when I learn what he's done, and

wonder why he hasn't tried to improve his situation. Another part of me sympathizes with him. He comes from a place of disadvantage, and when he loses his footing he reverts back to what he knows. This has been his achilles heel.

I understand that Angelo is in a great deal of trouble. What he has done, I do not know except for brief snippets from my mother which Angelo told her. Truth be told, I would rather not know. I think people need to face their crimes, but I also think that Angelo needs something substantial to last him. He could contribute so much to society, I fully believe in him. What he needs is counselling, support, and to get out of the projects. He needs a chance. I sympathize with Angelo because he reminds me of my own father, who had his share of struggles with the law and with drugs. I loved my father very much as he loved me, but he could never get on his feet and create a substantial life for himself. He died at the age of fifty three, when I was eleven. As the years go by, I fear that the same thing will happen to Angelo and Damien. No one should lose their father at such a young age, estranged or not.

I understand that every crime must be met by a consequence, but I find a prison sentence to be costly and overall a waste of time. While it is a comfort to know that he will be somewhere with a shelter and food, I don't think he would benefit from it. He needs first hand help by someone who cares, not a government employee who couldn't care less what he does. He needs nurturing, not ten years in a cell doing nothing.

I really don't know how to process this situation, but I am saddened and dissappointed by the overall chain of events leading to this. Please take into consideration what I have said, even if it does not sway the decision made I thought it important to voice my opinion. Angelo is not a one dimensional person and he needs to know that he is worth so much more.

Thank you.

Best Regards,

Bianca Estensen-Tijerino

Age 17

EXHIBIT C



Angelo and Damian playing chess. Summer 2011



Salmon Festival. Nimbus Fishery. 2006